UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DEREK E. GRONQUIST,

                     Plaintiff,

    v.

FAYE NICHOLAS, HEATHER ANNIS, CC3
PAUL PEMBERTON, STEVE BLAKEMAN,
KAREN BRUNSON, HAROLD CLARKE,
STEVE RAMSEY, RICHARD MORGAN,
STEVE TOOHEY, JOHN DOES I, II AND III
CLALLAM BAY CORRECTIONS CENTER
OFFICERS, DEPARTMENT OF
CORRECTIONS, and STATE OF
WASHINGTON,

                   Defendants.

No. C10-5374 RBL/KLS

**REPORT AND RECOMMENDATION**
**Noted for: September 2, 2011**

Before the Court is the motion for summary judgment of Defendants Faye Nicholas,

Heather Annis, Paul Pemberton, Steve Blakeman, Karen Brunson, Harold Clarke, Steve Ramsey,

Richard Morgan, Steve Toohey, the Department of Corrections (DOC), and the State of

Washington (collectively Defendants). ECF No. 18. The motion had an original noting date of

January 21, 2011. *Id.* On February 3, 2011, the Court extended the discovery deadline and

struck the noting date of Defendants' motion with leave to renew the motion. ECF No. 36. By

notice dated May 2, 2011, Defendants renewed their motion for summary judgment. ECF No.

52. On June 7, 2011, Plaintiff filed his response. ECF No. 65. The Court granted Plaintiff leave

to file his response a few days late. ECF No. 69.

REPORT AND RECOMMENDATION - 1

Having carefully reviewed the parties' pleadings, supporting declarations, and balance of the record, and viewing the evidence in the light most favorable to Mr. Gronquist, the undersigned recommends that the Defendants' motion for summary judgment be granted in part and denied in part.

## FACTS

**A.      June 17, 2007 Assault and Operation of Cell Doors**

The events at issue occurred while Plaintiff Derek E. Gronquist was in DOC custody at the Clallam Bay Corrections Center (CBCC) and was housed in C-Unit, Red Pod "A" tier.  ECF No. 21 (Declaration of Paul F. James), Exhibit A (Deposition of Derek E. Gronquist) at p. 5, line 23 to page 6, line 5.

On June 17, 2007, Mr. Gronquist was in his cell sleeping when he was awakened by the sound of his cell door "either unlocking or unclosing."  ECF No. 29, p. 1 (Declaration of Derek E. Gronquist in Support of Motion to Compel).  Another CBCC inmate, Dennis Florer, rushed at Mr. Gronquist and began to punch him repeatedly.  Mr. Gronquist kicked Florer away and was able to get to the door of his cell.  He repeatedly pushed the emergency call system button next to his door, but the cell door did not open (which it would have done if his cell was on "local") and no officer came in response to his emergency alert button.  *Id.*, p. 2.  He began kicking his cell door and an inmate in the pod came to his cell door and asked if he wanted out.  Mr. Gronquist told him "yes, it's an emergency."  Mr. Florer then attacked him from behind, slamming his head into the window and door of the cell.  Mr. Gronquist saw the inmate outside the cell waiving toward the booth officer to alert her to the assault.  Mr. Florer then slammed Mr. Gronquist's head into the cell door again and he began to lose consciousness.  The assault continued for

approximately fifteen minutes while Florer repeatedly slammed Mr. Gronquist against the wall, threw him into the sink and toilet, and punched and kicked him. *Id.*

Contrary to Mr. Gronquist's assertion, the Defendants maintain that the door to the cell was "on local". ECF No. 20 (Declaration of Faye Nicholas), p. 2, ¶ 6. This means the door to Mr. Gronquist's cell could be opened by pushing a button inside the cell. The door could be opened in this manner for approximately five to ten minutes after the door is placed on "local" by the booth operator. *Id.* (Nicholas Decl.) p. 2, ¶ 4. This allows the inmate an opportunity to leave his cell for mainline (to go to breakfast). *Id.* Defendant Nicholas placed the upper tier, Brown Pod "D" on local at 6:42 a.m. This is where Florer was housed. *Id.*, p. 2, ¶ 6. At 7:04 a.m., Defendant Nicholas placed the lower tier, Red Pod "A" tier on local. *Id.* Mr. Gronquist's tier is below Florer's tier. ECF No. 73 (Deposition of Fay Nicholas, April 25, 2011), p.p. 20-21; 32-33.

Mr. Gronquist maintains that the cell door did not open because his cell was no longer on local. ECF No. 29, p. 2. Francisco Salazarsandoval, a fellow prisoner confined in Red-Pod of C-Unit, saw a white inmate with a bald head approach Mr. Gronquist's cell door, place his hand on the handle of the cell door, and turn and look at the control booth officer. Mr. Salazarsandoval saw the booth officer look directly at the inmate and extend her arm as if she was unlocking Mr. Gronquist's cell door. ECF No. 65-2, pp. 50-51. Mr. Salazarsandoval then proceeded up the stairs and into his own cell. From there, he heard many loud banging sounds and yelling for help. *Id.*, p. 51.

Corrections Officer Faye Nicholas was in charge of the control booth at the time of the assault. *Id.* (Nicholas Decl.) at p. 2, ¶ 6. The control booth officer is primarily responsible for inmate movement and has a visual line of sight with every cell in the unit. *Id.*, ¶ 3. Part of the

control booth officer's job is to let inmates in and out of their cells.  *Id.*  June 17, 2007 was Ms.

Nicholas' first day in a closed custody unit and was part of her Core Program training.  ECF No.

73 (Nicholas Deposition), p. 7.  Prior to that time, she had worked only graveyard shift where

there was little inmate movement.  *Id.*

According to Ms. Nicholas, inmates from one pod are not allowed into another pod or

into other inmates' cells.  *Id.*, pp. 12-13.  A picture board in the control booth contains photos of

inmates allowed into each cell of C-Unit.  *Id.*, p. 18.  Ms. Nicholas did not know inmates Florer

or Gronquist prior to the incident of June 17, 2007.  Ms. Nicholas explained in her deposition

that it is not possible that she opened Mr. Gronquist's cell door because his tier was the last of

two to be called to mainline and mainline is a one-way movement – when doors are placed on

local, inmates exit.  Thus, there was no other reason to have opened the doors on the bottom tier

at that time.  (When doors are on local, however, they may be opened by either the inmate from

inside the cell or the booth operator.)  Inmates from the top tier, whose doors had been placed on

local prior to the bottom tier, were returning from mainline and she was opening doors on the top

tier only.  *Id.* at pp. 20-21; 32-33. When she opened Mr. Gronquist's door in response to the

flashing light at 7:24 a.m., the cell door was no longer on local – the light does not flash when

the cell door is on local.  *Id.*, pp. 23-24.

Correctional Sergeant Steven Toohey is Defendant Nicholas' supervisor.  On the morning

of June 17, 2007, he was the Unit Sergeant on duty.  He confirms that Defendant Nicholas was

assigned to the control booth for C Unit and Correction Officers Dupius and Heather Annis were

assigned to the floor.  ECF No. 19, p. 2.  Defendant Steve Blakeman was the custody unit

supervisor for C-Unit.  He testified that Defendant Nicholas were fully qualified to be in the

control booth; that the offenders names and photographs were in the control booth; and, that the

REPORT AND RECOMMENDATION - 4

booth officer is to verify whether an inmate is authorized to enter a cell before opening the door. ECF No. 82 (Deposition of Steve Blakeman, April 26, 2011), pp. 9, 17. Defendant Blakeman also testified that he was aware that Florer was a close custody inmate. *Id.*, p. 9.

Defendant Ronald Fraker, the current Superintendent of CBCC, testified that a booth officer is trained by someone in the booth and under the supervision of a unit sergeant and should be familiar with the operation of the booth before operating it alone. ECF No. 80 (Deposition of Ronald Fraker, April 26, 2011) p. 19. Superintendent Fraker also testified that he is not aware of any security failures at CBCC and is aware of an ongoing capital project to upgrade cell doors in the closed custody unit to slider doors. *Id.*, pp. 4-5.

According to Defendant Nicholas, Mr. Gronquist hit the call button inside his cell at about 7:25 a.m. This activated the call light inside the control booth. ECF No. 20 (Nicholas Decl.) at p. 2, ¶ 6. Defendant Nicholas saw the light and unlocked Mr. Gronquist's cell door, which was no longer on local. *Id.* Mr. Gronquist approached the duty station, dressed only in shorts and covered in blood. He saw Defendant Heather Annis standing with her head tucked into a corner of the duty station facing away from the inmate areas, with a telephone in one hand and a sandwich in the other. ECF No. 29 (Gronquist Decl.) at p. 3. Mr. Gronquist walked within two feet of Ms. Annis and gained her attention by announcing that he had just been assaulted. *Id.*

In her sworn statement to the Clallam County Sheriff's Department after the assault, Defendant Annis stated that Mr. Gronquist was covered with a substantial amount of blood and had a cut about one-half inch long on the top of his head. ECF No. 65-2, p. 15. Defendant Annis testified in her deposition that she did not witness Florer enter Red Pod and she did not see an

inmate in Red Pod waving his arms.  ECF No. 83 (Deposition of Heather Annis, April 25, 2011), pp. 10-11.

When Sergeant Toohey arrived on the scene, Mr. Gronquist was sitting in a chair and Florer was locked in Mr. Gronquist's cell.  Mr. Gronquist was escorted to medical and Florer was escorted to the Intensive Management Unit (IMU).   ECF No. 19 (Toohey Decl.), at p. 2.  Sergeant Toohey states that Florer was very calm and had a "smirk" on his face.  *Id.*

Video cameras monitoring inmate movements in and out of the pods are located on the units.  *See* ECF No. 21 (Gronquist Dep., p. 6).  Candace Germeau, a DOC investigator, viewed the surveillance video and testified that it shows only Florer entering the pod and entering a cell.  ECF No. 75 (Deposition of Candace Germeau, April 29, 2011), p. 16.   Ms. Germeau testified that aside from the incident in question, she never investigated any attempted extortions.  She also testified that Florer has sexually harassed staff in the past.  *Id.*, p. 15.

Paul Pemberton, a correctional counselor in C-Unit, viewed the surveillance video within a day or two after the assault.  He testified that the video showed Florer and other inmates walking into Red Pod and then Florer walking to a bottom-tier cell and entering.  The video does not show how Florer entered the cell, does not show other inmates, the entry to the C-Unit duty station or the control booth, and does not show an inmate waving his arms at the control booth.  ECF No. 79 (Deposition of Paul Pemberton, April 26, 2011), pp. 5-7.

Mr. Florer received an infraction for being in the wrong pod and cell and for assaulting a fellow inmate.  He was sanctioned with 60 days loss of good time and 20 days segregation.  ECF Nos. 65-1 pp. 54 and 55.  He also plead guilty to assault in the fourth degree in the Clallam County Superior Court.  He was sentenced to one year in prison to commence after his current prison term.  ECF No. 65-2, pp. 24-33.

REPORT AND RECOMMENDATION - 6

After the assault and in his deposition, Mr. Gronquist provided information relating to the circumstances leading to the assault. Mr. Gronquist had known Florer since 2006 when both individuals were inmates at the Stafford Creek Corrections Center (SCCC). ECF No. 21 (Gronquist Dep., p. 11, ll. 14-25). Mr. Gronquist provided legal advice to Florer when he was at SCCC and again at CBCC. *Id.*, p. 13, ll. 18-25; p. 15, l. 24 to p. 16, l. 6. In April 2007, Mr. Gronquist learned that he had obtained judgments against DOC in five public records actions and would be receiving about $65,000.00. *Id.*, p. 17, l. 1 to p. 18, l. 14. Mr. Gronquist shared this information with a friend, Jimmy Chea, who is also an inmate at CBCC. *Id.*, p. 18, ll. 15-22.

Several weeks before the assault, Florer approached Mr. Gronquist in the law library and told him:

> [T]here's some heavy hitters that have heard about that you won some money and that they want to take you down a notch, and he said that he'd ask them to wait so he could talk to me to see if we could go over some kind of agreement that would keep me from being harmed.

*Id.*, p. 21, ll. 1-5.

> He came to me and said that he had put an attack against me, or what he said is that they were gonna put some holes in me, indicating I was gonna be stabbed and that he put it on hold to see if he could talk to me about giving them money to not do that.

*Id.*, p. 21, l. 22 to p. 22, l. 1.

Defendant Nicholas was not aware that Florer had threatened Mr. Gronquist or that there was any animosity between them. ECF No. 20 (Nicholas Decl.), p. 2. In her statement to the Clallam County Sheriff's Department and in the initial serious infraction report, Defendant Annis stated that after the assault, Mr. Gronquist told her that he had been approached two weeks earlier in the law library by Florer. Florer told him "they" knew about the $72,000.00 he had been awarded by the state and that "they" wanted at least $40,000.00 or "they" would hurt him.

REPORT AND RECOMMENDATION - 7

ECF No. 65-2, p. 15. Mr. Gronquist told Defendant Annis that he did not know who "they" were and that he did not take the threat seriously. *Id.*

Mr. Gronquist admits that he did not tell anyone of the specific threats made to him by Florer. He testified that he told an unnamed Custody Unit Supervisor in the IMU that his life was in danger and that he told a Hispanic transport officer that he needed protection outside of DOC. It is not clear when these statements were made. Mr. Gronquist also states that he told his counselor, Defendant Pemberton, that his classification was overdue and he was requesting to be transferred out of the facility immediately. He did not tell Defendant Pemberton that he felt his life was in danger. ECF No. 21, Attach. A (Gronquist Dep.), pp. 15-18 (CMC/ECF pagination). In his declaration, Mr. Gronquist stated that his mother warned Defendant Brunson that his safety was in danger. ECF No. 29, p. 7. It is not known when this statement was made or whether an explanation of the danger was given. Mr. Gronquist testified as follows:

> Q: You didn't tell any member of Clallam Bay Correction Center that you felt that your life was in danger as a result of threats that Florer had made concerning an assault if money wasn't paid to you from the judgment you were going to receive from the Department of Corrections; is that correct?
> A: Prior to the assault?
> Q: Yes.
> A: No.
> Q: So prior to the assault, you told no one from DOC that Florer had threatened you?
> A: Correct.

*Id.*, p. 18.

**B. Florer's History**

On February 12, 2007, Hearings Officer James P. Tucker recommended that Florer be released from administrative segregation and placed into close custody at CBCC – M1 (B01). ECF No. 61-2, p. 17. According to the Administrative Segregation/IMS Referral, inmate Florer was referred to administrative segregation on December 9, 2003 for security threat group activity

REPORT AND RECOMMENDATION - 8

and multiple assaults on other inmates to carry out the White Supremacist agenda at the Washington State Penitentiary. While he was in administrative segregation, Florer had "been relatively appropriate in his behavior," he completed Anger Stress Management, and his last posted infraction was April 2006. *Id.*

Defendant Pemberton testified that he is familiar with Florer and Mr. Gronquist as both were on his case load. He was not aware of any prior infractions, aggressive behavior or gang affiliation as to Florer. ECF No. 79 (Pemberton Deposition), pp. 4-5.

## C.    Violence at CBCC

Several inmate on inmate assaults that occurred at CBCC between 2004 and 2007 involved inmates who entered a cell not their own in order to assault another inmate. ECF No. 61-2, Exh. 10, pp. 20-40. Some inmates gained access to another inmate's cell by simply following another inmate into the cell (*see, e.g.,* ECF No. 61-2, pp. 23, 24-26); during a "gate period" (*see, e.g., id.,* pp. 30-32); or because a cellmate opened the door for them (*See, e.g. id.,* ECF No. 61-2, pp. 20, 29, 30-32, 37). Some of the incident reports reveal the reason for the assault (inmate called a "rapo"; inmate disrespected other; inmate called a punk) (*see, e.g. id.*, pp. 21, 24-26, 30-32, 33), while others do not note any reason behind the assault.

In a letter dated September 10, 2007, Harold Clarke, Secretary of the DOC, issued an emergency declaration pursuant to RCW 39.04.020 to obtain contracts for design, purchasing, and construction at the CBCC. Mr. Clarke stated that CBCC was having problems with its electronic detention control systems at Control Booths and at Major Control and Movement Control points involving touch screens, file servers, computers that frequently lockup requiring rebooting of the security systems, and that the current equipment is out of date and no longer supported by the manufacturer. He also stated that the electronic detention control system is

unreliable and poses a real and immediate threat to the proper performance of essential security control functions at the CBCC and if immediate action is not taken, there is a high risk of material loss or damage to property, bodily injury, or loss of life. ECF No. 61-3, pp. 4-5.

Karen Brunson, the former Superintendent of CBCC, testified that she had no knowledge of any increase in violence at CBCC between 2004 and 2007. ECF No. 81 (Deposition of Karen Brunson, April 27, 2011), p. 13. In her Prisons Division Quarterly Report for the fourth quarter of 2007, Ms. Brunson listed violence related infractions that included aggravated assault on another offender (a total of 6 for all four quarters of 2007) and assaults on another offender (a total of 25 for all four quarters of 2007). ECF No. 29, p. 50.

## STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023-24 (9th Cir. 2004). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth

REPORT AND RECOMMENDATION - 10

specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001). This is true even when a party appears pro se. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where, as here, the nonmoving party is pro se, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

## MOTIONS TO STRIKE

### A.      Defendants' Motions to Strike

Defendants move to strike Plaintiff' entire response to their motion as untimely. ECF No. 68, p. 2. There is no basis for the Court to do so as it granted Plaintiff leave to file his response a few days late on June 7, 2011. ECF No. 69. Defendants also object to Mr. Gronquist's reliance on the declarations (with attached exhibits) that were filed previously in this action (ECF Nos. 29 and 51) and his reliance on the deposition transcripts of Denise Larson, Candance Germeau, Karen Brunson, Steven Toohey, Steven Ramsey, Faye Nicholas, Steve

Blakeman, Heather Annis, Paul Pemberton, William Paul and Ronald Fraker.  As noted above,

the declarations are part of the record in this case and Mr. Gronquist may properly refer to and

rely on them.  Defendants make no specific objection to the exhibits attached to the declarations.

The Court will consider the declarations and the exhibits, to the extent they are otherwise

potentially admissible.  *See Jones v.* Blanas, 393 F.3d 918, 923 (9th Cir.2004) ("we must

consider as evidence in his opposition to summary judgment all of [the pro se plaintiff's]

[potentially admissible] contentions offered in motions and pleadings").  The evidence need not

be in admissible form, but merely susceptible of being placed in such form at trial.  *Fraser v.*

*Goodale*, 342 F.3d 1032, 1036 (9th Cir.2003); *see also Aholeli v. Hawaii Dept. Of Public Safety*,

220 Fed. Appx. 670 (9th Cir.2007).

Although Mr. Gronquist did not attach excerpts of the deposition transcripts referred to in

his response, he did cite to specific pages within the depositions and he filed the complete

original deposition transcripts with the Court on June 16, 2011.[1]  Therefore, they have been

docketed and may be considered.  *See,* ECF Nos. 73-83.

Defendants also move to strike two exhibits Mr. Gronquist obtained through Public

Record Acts requests:  a pre-design study by KMB Design Groups, and a news article "To Kill

or be Killed."  ECF No. 68, p. 2.  These exhibits are hearsay and will not be considered by the

Court.   *See* Fed. R. Civ. P. 56(c)(4) (affidavit or declaration used to support or oppose a motion

must be made on personal knowledge and show that the affiant or declarant is competent to

testify on the matters stated).

---

[1] Mr. Gronquist attempted to file the original deposition transcripts in support of motions he anticipated filing.  The Court returned the depositions to him at that time because no motion had been filed.  ECF No. 59.

**B.      Plaintiff's Motion to Strike and Claim of Spoliation**

       **1.      Memo of Involvement of Heather Annis**

Plaintiff moves to strike the "Memo of Involvement" from Heather Annis dated May 18, 2010.  The memo is attached to the Declaration of Assistant Attorney General Paul F. James.  ECF No. 21, p. 22.  The memo is not signed or verified nor is Mr. James competent to testify on the matters stated in the memo.  Accordingly, the memo will not be considered by the Court.

       **2.      Surveillance Video of C-Unit on June 17, 2007**

Mr. Gronquist asks the Court to permit an adverse inference that the surveillance video or videos of CBCC's C-Unit for June 17, 2007 would have shown that:  (1) Defendant Nicholas knowingly permitted Florer to enter Mr. Gronquist's cell; (2) the length of the assault; (3) the presence of another inmate waiving his arms to alert the guards of the assault; and (4) failure of the guards to render aid.

The surveillance videos of CBCC's C-Unit for June 17, 2007 were not preserved by the C-Unit manager or the on-duty shift lieutenant and were recorded over in the normal course of business.  ECF No. 61-2, p. 15 (Defendants' Responses to Plaintiff's Third Set of Interrogatories and Production Requests).   Plaintiff's public records request for the surveillance videos was also denied in September 2007 based on security reasons, pursuant to RCW 42.56.420(2).  ECF No. 61-2, p. 7 (Defendants' Second Supplemental Answers to Plaintiff's Interrogatories and Requests for Production)**.**  A document entitled "Newsbrief 07-03" dated June 11, 2007 attached as Exhibit 12 to Mr. Gronquist's Declaration in Support of Motions to Compel and Impose Sanctions (ECF No. 61), indicates that fixed security surveillance tapes should be withheld from disclosure in their entirety pursuant to RCW 42.56.420(2) and .240(1), but that a copy of the responsive recording must be pulled and retained in the public disclosure file for six years.  ECF

No. 61-3, p. 7.  The "Newsbrief" also indicates that because surveillance tapes are re-used, it is imperative that appropriate staff be immediately contacted to ensure a copy is made and provided prior to its destruction.  *Id.*  A DOC Request for Records Retention Schedule dated September 5, 2007 includes a new request to retain all recordings and monitoring for any facility or site for one year.  ECF No. 65-1, p. 63.  In her deposition, Denise Larson, who was the administrative assistant for CBCC in June of 2007, testified that she was familiar with Mr. Gronquist's public records request but she did not assist in compiling responsive documents.  She testified that there was never a copy of the surveillance videotape in his public-records file at any time she reviewed the file.  ECF No. 76, p. 7.  She also testified that she is familiar with the Newsbrief and that she refers to it when she processes a public-records file request dealing with surveillance.  *Id.*

"A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence."  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993).  The Court's broad authority includes the power to permit an adverse inference from the spoliation of relevant evidence against the spoliating party.  *See Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991).  "An adverse inference is an instruction to the trier of fact that 'evidence made unavailable by a party was unfavorable to that party.'"  *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D.Cal.2009).  A finding of bad faith is not a prerequisite for an adverse inference.  *Glover*, 6 F.3d at 1329.

According to Defendants, the surveillance video is not relevant because it would have shown only that Florer entered Mr. Gronquist's cell – a fact they do not dispute – and would not have shown who allowed Florer to enter the cell.  In her deposition, Candace Germeau, a DOC investigator who is not a defendant, testified that she viewed the surveillance video and it shows only Florer entering the pod and entering a cell.  (Deposition of Candace Germeau, April 29,

2011, p. 16).  In his deposition, Defendant Pemberton confirmed that the video does not show entry to the C-Unit duty station, does not show how Florer accessed the cell and did not show any inmate waiving his arms at the control booth.  Defendants also argue that under Washington state law, prison surveillance videos are exempt from public disclosure as being essential to effective law enforcement.  *Fischer v. Dep't of Corrections,* 160 Wash. App. 722, __ P.3d __ (2011); Wash. Rev. Code § 42.56.240(1).

With the exception of Mr. Gronquist's allegation that an inmate stood in the hall waiving his arms to gain the attention of the control booth officer, the remaining facts are not in dispute here.  Defendants do not dispute that Florer entered Mr. Gronquist's cell.  They do not dispute that Florer was in the cell approximately 20 minutes and during that time, attacked and injured Mr. Gronquist.

In addition, there is no evidence as to whether Defendants had sufficient notice of the claim, or potential claim, so that its duty to preserve the surveillance video was triggered.  A party is guilty of spoliation of evidence only if it had "some notice that the [evidence was] potentially relevant to the litigation."  *United States v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir.2002) (citation omitted).  The duty to preserve evidence arises when a party has notice of a potential claim.  *E.g., Taylor v. Market Transport Ltd*., 2010 WL 959931 (W.D.Wash.); *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc*., 264 F.R.D. 517, 2009 WL 1258970 (N. D.Cal.); *Hynix Semoconductor Inc. v. Rambus Inc*., 591 F.Supp.2d 1038 (N.D.Cal.2006).

The record is silent as to when the surveillance video was "taped over" in relation to when the litigation began – the assault occurred in June 2007 and this lawsuit was commenced in Thurston County Superior Court in May 2010.  In August 2007, Mr. Gronquist made a public

records request for the video tapes and DOC policy indicates that the surveillance tape would not have been provided to him but retained for six years. Based on this record, however, the Court cannot determine whether Defendants had notice of the potential litigation such that their duty to preserve the video was triggered and whether "taping over" the video qualifies as willful spoliation, *i.e.,* whether Defendants had some notice that the documents were potentially relevant to the litigation before they were destroyed. *Leon v. IDX Systems Corp.* 464 F.3d 951, 959 (9th Cir.2006) (citing *Kitsap Physicians Serv.*, 314 F.3d at 1001).

In light of the minimal relevance of the contents of the video and absence of evidence as to when Defendants had notice, the Court finds that an adverse inference is not warranted.

## DISCUSSION

**A.    Eighth Amendment – Failure to Protect**

The Eighth Amendment requires that the conditions of a prisoner's confinement, even if harsh, have some legitimate penological purpose. *See Hudson v. Palmer,* 468 U.S. 517, 584, 104 S. Ct. 3194, 82 L.Ed 393 (1984); *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). It is important to bear in mind that confinement "strips [prisoners] of virtually every means of self-protection." *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, "prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." *Id*. A failure to protect prisoners from attacks by other prisoners amounts to an Eighth Amendment violation if the deprivation is "objectively, sufficiently serious" and prison officials had a "sufficiently culpable state of mind," namely deliberate indifference. *Id.* at 834. To be deliberately indifferent, a prison official must know of, or infer from the circumstances, a risk of harm or injury that "is not one that today's society

REPORT AND RECOMMENDATION - 16

chooses to tolerate," yet fail to take reasonable actions to mitigate or eliminate that risk. *Farmer,*

511 U.S. at 837.

The following paraphrasing of the *Farmer* standard of deliberate indifference by Judge

Posner of the Seventh Circuit Court of Appeals is instructive:

> [T]o be guilty of "deliberate indifference" [prison officials] must know
> they are creating a substantial risk of bodily harm. If they place a prisoner in a
> cell that has a cobra, but they do not know that there is a cobra there (or even that
> there is a high probability that there is a cobra there), they are not guilty of
> deliberate indifference even if they should have known about the risk, that is,
> even if they were negligent – even grossly negligent or even reckless in the tort
> sense – in failing to know. *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982).
> But if they know that there is a cobra there or at least that there is a high
> probability of a cobra there, and do nothing, that is deliberate indifference.

*Billman v. Indiana Dep't of Corrections,* 56 F.3d 785, 788 (7th Cir. 1995). *See also Jensen v.*

*Clarke,* 94 F.3d 1191, 1197 (8th Cir. 1996), *quoting Billman,* 56 F.3d at 788.

It is uncontested that Florer was in the wrong pod and wrong cell and that he attacked Mr.

Gronquist. Defendants do not argue that this deprivation is not serious for purposes of the

Eighth Amendment. Rather, they argue that even if Defendant Nicholas was the one who

opened the cell door allowing Florer to gain entry to Mr. Gronquist, there is no evidence that

they knew that Florer posed a risk of harm to Mr. Gronquist. Mr. Gronquist has the burden to

show indifference to a known danger.

The question here is whether there is evidence, either direct or circumstantial, that

Defendant Nicholas was aware that she was letting a "cobra" in the cell when she opened the cell

door for Florer. Defendant Nicholas knew that inmates from one pod are not allowed into

another pod or into other inmates' cells. In fact, a picture board in the control booth contains

photos of inmates allowed into the cells of C-Unit. Defendant Nicholas did not know Mr.

Groquist or Florer prior to the incident and she does not state what, if anything, she did to ensure

REPORT AND RECOMMENDATION - 17

that Florer was not accessing the wrong cell. Thus, there is a question of fact as to whether Defendant Nicholas complied with the proper procedures when she opened the door. While this is evidence of negligence, negligence is not actionable under the Eighth Amendment. *See Farmer,* 511 U.S. at 835-36 & n. 4. Even if Defendant Nicholas opened the wrong door while failing to follow procedures, this evidence does not create a triable issue of fact as to whether her conduct rises to the level of a constitutional violation, *i.e.,* that she was deliberately indifferent to Mr. Gronquist's safety. The incident took place in the close custody units and while it is probably safe to assume that more violent prisoners are housed in the close custody units, there is no evidence that Mr. Gronquist was in particular danger from Florer and even if he was, that Defendant Nicholas knew of that danger. In fact, Mr. Gronquist acknowledges that he never told CBCC staff that Florer had threatened to do him bodily harm if he did not share his money judgment with Florer and that he did not take the threat seriously. He also testified that he has known Florer since 2006 and provided legal advice to Florer on several occasions.

Mr. Gronquist argues that CBCC is an "exceptionally" violent prison and lacked an adequate security system. There is evidence that there was an ongoing capital project to upgrade cell doors in the close custody unit to slider doors, but there is no evidence of security failures due to an inadequate security system. Mr. Gronquist also argues that Florer had just been released from three years confinement in maximum security for gang-related inmate assaults and that Florer had not been "stepped-down" properly from maximum to close custody. It is undisputed that Florer was referred to administrative segregation for security threat group activity and multiple assaults on other inmates relating to the White Supremacist agenda. ECF No. 61-2, p. 17. Florer was released to CBCC close custody sometime on or after February 20, 2007, about four months prior to his assault on Mr. Gronquist. At the time of his release, it was

noted that Florer was not a management problem since his last level demotion, his last infraction was in April of 2006, and he had completed Anger Stress Management. ECF No. 61-2, p. 17.

Even viewing these allegations and the evidence in a light most favorable to Mr. Gronquist, the evidence does not reflect that the assault on Mr. Gronquist was due to a prevailing atmosphere of violence, an inadequate security system, or that it was gang-related or related to a White Supremacist agenda. The record reflects that Florer threatened Mr. Gronquist with bodily harm if Mr. Gronquist did not pay up, that the threat occurred two weeks prior to the assault, and that Mr. Gronquist did not take the threat seriously and did not report the threat to any staff at the CBCC. Mr. Gronquist's generalized statements to other unidentified individuals that he felt his life was in danger and requests for a reclassification and immediate transfer also fail to support a conclusion that Defendants knew, or knew of facts from which they could have reasonably inferred, that Mr. Gronquist was at risk of danger from Florer. Such generalized knowledge does not constitute deliberate indifference. The prison officer must have "more than a mere suspicion that an attack will occur." *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir. 1986) (quoting *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (9th Cir. 1983)).

Thus, merely failing to exercise due care in failing to prevent an assault by other prisoners will not suffice. *Farmer,* 51 U.S. at 835, 837; *see also Davidson v. Cannon*, 474 U.S. 344, 345-48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (finding that prison officials' negligent failure to heed prisoner's notification of threats from another inmate, followed by an assault, is not a deprivation of constitutional rights); *see also Schwartz v. County of Montgomery*, 843 F. Supp. 962 (E.D. Pa.), *aff'd*, 37 F.3d 1488 (3d Cir.1994) (stating that corrections officers' failure to observe institutional policies regarding the supervision of dangerous inmates constitutes

REPORT AND RECOMMENDATION - 19

negligence, which cannot support a § 1983 action for violation of the Eighth or Fourteenth Amendments).

Thus, Defendants cannot be said to have failed to take reasonable measures to protect Mr. Gronquist or were deliberately indifferent to a risk of attack from Florer. Mr. Gronquist's claims against Defendants Does I, II and III also fail as they are based upon a claim that they recklessly disregarded substantial risks of an assault by Florer.

On the other hand, questions of fact remain as to whether Defendant Nicholas, along with Defendant Annis, who was assigned to floor duty, failed to timely render assistance to Mr. Gronquist. Mr. Gronquist states that although he repeatedly pushed his emergency call button for assistance, yelled for help, and another inmate waved his arms at the control booth in an attempt to obtain the attention of the guards, no one came to his assistance during the fifteen minutes when Florer was in the cell assaulting him. Defendant Nicholas states that she unlocked Mr. Gronquist's cell door at 7:25 in response to his call button. Defendant Annis states that she did not see Florer enter Red Pod and did not see an inmate in Red Pod waiving his arms. Inmate Salazarsandoval states that he heard loud banging sounds and calls for help from inside his cell, which was a floor up from Mr. Gronquist's cell. Viewing these facts in the light most favorable to Mr. Gronquist, a jury could conclude that Defendants Nicholas and Annis were deliberately indifferent to Mr. Gronquist's calls for help.

Based on the foregoing, the Court concludes that there is a genuine issue of material fact that precludes summary judgment as to Defendants Nicholas and Annis. All other defendants should be dismissed because there is no evidence of their personal involvement in the claimed constitutional deprivation.

REPORT AND RECOMMENDATION - 20

**B.** **Personal Involvement – Defendants Clarke, Morgan, Ramsey, Brunson, Blakeman, Pemberton, and Toohey**

To obtain relief against a defendant, Mr. Gronquist must prove the particular defendant has caused or personally participated in causing the deprivation of a particular protected constitutional right. *Arnold v. International Business Machines Corp.,* 637 F.2d 1350, 1355 (9th Cir. 1981); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977). To be liable for "causing" the deprivation of a constitutional right, the particular defendant must commit an affirmative act, or omit to perform an act, which he or she is legally required to do, which causes the plaintiff's deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Absent some personal involvement in the allegedly unlawful conduct of subordinates, defendants cannot be held liable under 42 U.S.C. § 1983. *Johnson v. Duffy* 588 F.2d 740, 743-44 (9th Cir. 1978).

Mr. Gronquist provides no evidence of the involvement of Defendants Clarke, Morgan, Ramsey, Brunson, Blakeman, Pemberton, or Toohey in the events leading up to or during the assault by Florer. Knowledge and acquiescence in a subordinate's unconstitutional conduct is insufficient; government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others. *See Ashcroft v. Iqbal*, ---U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Iqbal*, 129 S.Ct. at 1948.

Accordingly, the undersigned recommends that Mr. Gronquist's claims against Defendants Clarke, Morgan, Ramsey, Brunson, Blakeman, Pemberton, and Toohey be dismissed with prejudice.

## C. Eleventh Amendment Immunity

Defendants State of Washington and Department of Corrections (DOC) argue that they are not "persons" subject to suit in a § 1983 action. Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity, *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 472-473, 107 S.Ct. 2941, 2945-2946, 97 L.Ed.2d 389 (1987) (plurality opinion), or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity. *Will v. Michigan Dept of State Police,* 491 U.S. 58, 109 S. Ct. 2304, 2309-10 (1989).

A state may waive Eleventh Amendment immunity if it voluntarily consents to be sued in federal court. *Stanley v. Trustees of California State University,* 433 F.3d 1129, 1133 (9th Cir. 2006). The complaint in this case was originally filed by Mr. Gronquist in Thurston County Superior Court. On May 26, 2010, the State of Washington and DOC filed a notice of removal based on the Court's original jurisdiction of questions of federal substantive law. ECF No. 1. By choosing to remove Mr. Gronquist's federal and state law claims to federal court, Defendants State of Washington and DOC engaged in affirmative conduct that "is incompatible with an intent to preserve" their immunity. *Hill v. Blind Indus. & Services,* 179 F.3d 754, 758 (9th Cir. 1999); *Embury v. King,* 361 F.3d 562, 566 (9th Cir. 2004).

The motion for summary judgment of the State of Washington and DOC based on Eleventh Amendment immunity should, therefore, be denied.

REPORT AND RECOMMENDATION - 22

**D.      Qualified Immunity**

Having concluded that genuine issues of material facts exist as to whether Defendants Nicholas and Annis were deliberately indifferent to Mr. Gronquist's safety, in violation of the Eighth Amendment, the court next addresses whether they are entitled to qualified immunity.  A Court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *See Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

Although the facts at trial might show otherwise, at this stage, the unresolved factual allegations as viewed in the light most favorable to Mr. Gronquist show that Defendants Nicholas and Annis acted with deliberate indifference to his cries for help from an assault. Qualified immunity is not appropriate at this stage because it was clearly established at the time of the alleged violations that reasonable officers in Nicholas and Annis's positions would have known that failure to respond to repeated emergency calls, cries for help, and an inmate waiving his arms to gain their attention, exposed Mr. Gronquist to a substantial risk of serious harm. "If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir.1995).

Because the Court cannot say as a matter of law that it was objectively reasonable for Defendants to believe that the facts as they stand on summary judgment showed no violation of a clearly established right, these issues remains to be resolved in further proceedings, and

summary judgment on Defendants Nicolas and Annis' request for qualified immunity should be denied.

**E.      State Law Claims of Negligence**

Mr. Gronquist alleges that Defendants should also be held liable under Washington law for negligence.  Under *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court has discretion to try pendent state claims with federal claims if they derive from a common nucleus of operative facts.  However, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claim should be dismissed as well." *Id.* at 726, 86 S. Ct. at 1139 (footnote omitted). *See also, Arizona v. Cook Paint & Varnish Co.*, 541 F.2d 226, 227-28 (9th Cir. 1976) (per curiam), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977) (reading *Gibbs* and *Wham-O-Mfg. v. Paradise Mfg. Co.*, 327 F.2d 748, 752-54 (9th Cir. 1964) as only requiring district courts not to reach out to decide state law questions that need not be decided).   Pendent state law claims should be dismissed without prejudice. *See Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 509 (9th Cir. 1989) (citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 108 (1988)).

Thus, the undersigned recommends that Mr. Gronquist's pendent state law claims of negligence be dismissed without prejudice as to all Defendants, except as to Defendants Nicholas and Annis (only as to claims that they failed to timely assist or come to Mr. Gronquist's aid during the attack); *see, e.g., Shea v. City of Spokane,* 17 Wn.App. 236, 241, 562 P.2d 264 (1977), *aff'd*  90 Wn.2d 43, 44, 578 P.2d 42 (1978) (jailer has duty to keep prisoner in health and safety).

# CONCLUSION

Based on the foregoing, the undersigned recommends as follows:

(1)     Defendants' Motion for Summary Judgment (ECF No. 18) should be **GRANTED as to** Defendants Clarke, Morgan, Ramsey, Brunson, Blakeman, Pemberton, and Toohey. Plaintiff's federal claims against them should be **DISMISSED WITH PREJUDICE**; Plaintiff's state claims against them should be **DISMISSED WITHOUT PREJUDICE**;

(2)     Defendants' Motion for Summary Judgment (ECF No. 18) should be **DENIED** on grounds of Eleventh Amendment immunity as to Defendants Department of Corrections and the State of Washington; and,

(3)     Defendants' Motion for Summary Judgment (ECF No. 18) should be **DENIED as to** Defendants Nicholas and Annis (as to claims that they failed to timely assist or aid Plaintiff during the attack).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure (Fed. R. Civ. P.), the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **September 2, 2011**, as noted in the caption.

DATED this  12th  day of August, 2011.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 25